BOARD OF EDUCATION OF BALTIMORE COUNTY
*v.* CARROLL O. WHEAT, JR.
[No. 58, January Term, 1938.]

*Decided May 20th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*William L. Rawls* and *William L. Marbury, Jr.,* with whom were *Cornelius V. Roe* and *G. Van Velsor Wolf* on the brief, for the appellant.

*Edward H. Burke* and *Robert R. Bowie,* with whom were *Lawrence E. Ensor, William P. Bolton,* and *Bowie & Burke,* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

The infant appellee, a pupil at a Roman Catholic parochial school in Baltimore County, the Immaculate School, has been granted the writ of mandamus to compel the Board of Education of the county to carry him to and fro between his home and the school, in accordance with a public local law of the county (Acts of 1937, chapter 185), ordering transportation of such a child in a bus provided for public school children. The board has appealed, and on its appeal questions the validity of the provision on several grounds, but principally that, as the school he attends is a private school, and he is attending it, rather than the public school, for the religious training of his parents' choice, the promotion of his convenience in doing so is in effect a diversion of public school funds to a private purpose, and a contribution to the maintenance of a place of worship in contravention of the Declaration of Rights of the State.

The statutory provision (Acts 1937, ch. 185, p. 321, sec. 146A), is that all children who attend schools in the county which do not receive state aid, and who reside on or along or near the public highways on which there is now or hereafter operated a public school bus provided by the Board of Education for transporting children to and from the public schools, shall be entitled to transportation on the same buses from a point on the highway nearest or most accessible to the home of the child to a point nearest or most accessible to its school, without changing the route of the bus, upon the same terms as those provided for public school children. A second section of the statute (Acts 1937, ch. 185, p. 322, sec. 146B) provides for the raising of money necessary, not exceeding $15,000, for the additional expense, and authorizes the establishment of additional bus routes. Funds for the purpose have been appropriated by the county commissioners, but the board, questioning the validity of the enactment, has declined to administer them.

To the petition for the writ the board answered setting up its contentions, the petitioner demurred to the answer,

and the demurrer was sustained; and no further proceedings being taken, the writ was ordered to issue.

There is no dispute of fact. It is conceded that this child, who lives about four hundred feet from a road along which a public school bus passes, and whose school is about three miles on the road toward Towson where the public school is situated, is in all respects within those entitled to transportation under the questioned statute, if it is valid. The school does not receive state aid. It is conducted in connection with a Roman Catholic church, the Immaculate Church, its pupils are taught and disciplined by sisters of that church, and during school sessions they are given instruction in the Roman Catholic faith, and at times attend for worship in the church.

Compliance of the title of the act with the constitutional requirement that the subject should be described in it is questioned. Constitution, art. 3, sec. 29. It is, in brief, "An Act to add two new sections to Offutt's Revised Code of the Public Local Laws of Baltimore County * * * to follow Section 146 * * * and to be known as Section 146A and Section 146B, directing the Board of Education of Baltimore County to provide certain transportation for children attending certain schools in Baltimore County, and directing the County Commissioners * * * to appropriate certain funds." The appellee refers to the rule that a description merely by designation of article and sections added to the Code may be sufficient. *Dean v. Slacum*, 149 Md. 578, 132 A. 73. But this title does not leave the description at that; it undertakes to give more information and the objection is that what is given is misleading. *Buck Glass Co. v. Gordy*, 170 Md. 685, 688, 185 A. 886. It is objected that "certain schools" in a statute, especially one appropriating certain public funds, would lead to an assumption that public schools were dealt with in the body of the enactment. The facts that provision for public schools only is the concern of the Legislature, and that in common understanding "schools" in any governmental provision would regularly be public schools, are urged as having an effect

to conceal, under this title, a provision for conveying children to and from private and parochial schools. *State v. King,* 124 Md. 491, 498, 92 A. 1041; *Culp v. Chestertown,* 154 Md. 620, 625, 141 A. 410; *Buck Glass Co. v. Gordy, supra.*

The question is one of degree of likelihood of leading to a misconception of the enactment, and the court has come to the conclusion that in this instance the likelihood is not so great as to render the title insufficient. *Culp v. Commissioners, supra.* For testing conformity of a title to this constitutional requirement, there is enjoined upon the courts a disposition to uphold rather than to defeat the enactment. *State v. Norris,* 70 Md. 91, 96, 16 A. 445; *Barron v. Smith,* 108 Md. 317, 327, 70 A. 225.

A second ground of objection is that of a violation of the prohibition in article 3, section 33, of the Constitution against passage of a special law for any case for which provision has been made by an existing general law. The present local act is in the argument considered to be a special one, excluded by the provisions in article 77 of the Code of Public General Laws concerning expenditures by the board for school purposes, and the transportation of pupils of schools. Section 56 of article 77 requires the Board of Education of each county, subject to the rules and regulations of the State Board, with the advice of the County Superintendent, to prepare a budget, "showing the unexpended balance on hand or in [its] treasury for each specific purpose allowed and levied by the County Commissioners at the preceding levy the amount of money needed for permanent improvements and repairs, and for current repairs, furniture for old buildings, maintenance and support of schools during the succeeding school year, also the estimated total amount that will be received from the State, which shall be used for paying teachers' salaries and purchasing text-books, materials of instruction, and school supplies; and finally the amount that will be needed to be raised by local taxation." Section 50 was passed as an incident to an authority to consolidate schools previously

existing, adding to that authority a provision that the county board of education "shall pay, when necessary, for the transportation of pupils to and from such consolidated schools."

The court does not see that these sections must exclude subsequent local legislation, otherwise valid, for conveyance of private school children. Another subject of expense might properly be added to those enumerated, and might be added for the one county if the General Assembly should find reason for it. The constitutional prohibition now considered is not against local laws but against special laws. *County Commissioners of Dorchester County v. Meekins*, 50 Md. 28, 39. The requirement would be a special law only if it should be regarded as a provision for selected persons or institutions. *State v. Baltimore County Commissioners*, 29 Md. 516, 519; *Dasch v. Jackson*, 170 Md. 251, 261, 183 A. 534. And if it is a special law by that definition, its subject matter does not seem to the court to have been provided for in the existing general law, section 56, with the consequence that the special law is prohibited. Nor is an exclusive covering of the subject found in section 50. Being part of a provision for consolidating the schools, it is itself one of limited scope and purpose, that is, to obviate the disadvantage of distance of the centralized schools from many pupils. It does not attempt to cover the whole subject of conveyance of school children, so as to exclude extension of the use of buses by a subsequent local law.

Does it, then, as a provision for private school children, violate the prohibition against the use of funds for private purposes in articles 15 and 23 of the Declaration of Rights, and violate that of the Fourteenth Amendment to the United States Constitution by taking money of the taxpayers for the use of private institutions? *Baltimore & Eastern Shore R. Co. v. Spring*, 80 Md. 510, 31 A. 208; *Citizens' Sav. & Loan Assn. v. Topeka*, 20 Wall. 655, 22 L. Ed. 455; *Jones v. City of Portland*, 245 U. S. 217, 38 S. Ct. 112, 62 L. Ed. 252; *Green v. Frazier*, 253

U. S. 233, 40 S. Ct. 499, 64 L. Ed. 878. The actual provision is more narrowly limited than the question might suggest. It is, in substance, that the buses provided to transport public school children shall also accommodate children of the private schools entering and leaving along the road. No buses are to be provided for private school children especially, although an increase in the number of all children to be carried might, of course, necessitate an increase in the number and expense of conveyances. All the conveyances referred to, even in the authorization of new routes in the second section, are those described in the first section, the public school buses. And the accommodation of private school children is an incidental use of provision made for an unquestioned public purpose.

It is not a use of surplus space that is provided for, within the principle applied in permitting private use of schools and other public buildings. *Gottlieb-Knabe Co. v. Macklin,* 109 Md. 429, 71 A. 949; *Cost v. Shinault,* 113 Ark. 19, 166 S. W. 740; 63 *A. L. R.* 616; *State v. Cleveland,* 125 Ohio St. 230, 181 N. E. 24. It is a use without regard to extra space, and money is to be provided by the taxpayers for an expected expense from it. And if that use is a private one, then there are limits to the application of public money and facilities to it. *Gottlieb-Knabe Co. v. Macklin, supra; Citizens' Sav. & Loan Assn. v. Topeka,* 20 Wall. 655, 22 L. Ed. 455; *Jones v. City of Portland,* 245 U. S. 217, 38 S. Ct. 112, 62 L. Ed. 252; *Green v. Frazier,* 253 U. S. 233, 40 S. Ct. 499, 64 L. Ed. 878.

Whether it is private within that rule appears to be, finally, a question whether it is in furtherance of a public function in seeing that all children attend some school, and in doing so have protection from traffic hazards. School attendance is compulsory, and attendance at private or parochial schools is a compliance with the law. Code, art. 77, secs. 220 and 221, 14, 21 and 228. For the board it is argued that the act cannot be classed as a measure of protection from traffic hazards because it affects only a small portion of private school children

equally subject to those hazards. As the buses are not to convey to any public schools other than the consolidated ones, there is no protection given to children attending others. Neither is there any given to children attending schools receiving state aid, those attending one school supported by the State, those who do not reside along routes of the public school buses, or those whose schools are within a mile of their homes. And to the reply that these are the limitations on the buses and their routes, the public school buses being availed of to convey all children within the class along those routes, it is argued further that the public school buses themselves are not supplied for protection against traffic hazards, but only, as stated, to overcome the disadvantage of increase of distance for many pupils as a consequence of the consolidation of schools. The limit on the originating object would not, however, prevent public utilization of any further advantages that might be developed from use of the buses. In other words, if the buses to and from the consolidated schools have been found valuable in later days as protections against traffic hazards, they may be dealt with as such protections. And the great increase in traffic dangers to children since the enactment of section 50 of article 77, in 1916, might well be regarded as having given the buses the newer purpose.

With that purpose possible, then, is the act to be regarded as a provision for supplying the public school facilities to private schools? The question includes provision to parochial schools, one kind of private schools. Courts elsewhere, which in cases cited to us have dealt with somewhat similar questions, have not agreed in their views. In *Cochran v. Louisiana State Board of Education*, 281 U. S. 370, 50 S. Ct. 335, 74 L. Ed. 913, the Supreme Court of the United States decided that an appropriation of taxpayers' money to provide textbooks to children of private schools did not violate the Fourteenth Amendment, mainly because the books were, by the terms of the authorizing statute, to be supplied directly to the children. In the state court from which

the appeal was taken three of the seven judges sitting
dissented from that view. *Borden v. Louisiana State
Board*, 168 La. 1005, 123 So. 655. Compare *Synod of
South Dakota v. State*, 2 S. D. 366, 50 N. W. 632; *State
v. Hallock*, 16 Nev. 373. And it has gone without ques-
tion since. Possible difficulties in distinguishing supply
of other school facilities, and the ease of evasion of the
constitutional prohibition by the mere form of appropri-
ating money to children rather than to private institu-
tions, have been remarked. See *A. A. Bruce*, in 25 Illinois
Law Rev. 547. There have been decisions in conflict,
especially in cases of facilities supplied to religious insti-
tutions. *State ex rel. Traub v. Brown*, 6 W. W. Harr.
181, 36 Del. 181, 172 A. 835; *State v. Milquet*, 180 Wis.
109, 192 N. W. 392; *Smith v. Donahue*, 202 App. Div. 656,
195 N. Y. S. 715; *Otken v. Lamkin*, 56 Miss 758. In two
cases in courts of inferior jurisdiction (*Lewis v. Board of
Education*, 275 N. Y. 480, 11 N. E. (2nd) 307, appeal
dismissed *Id.*, 275 N. Y. 544, 11 N. E. (2nd) 743, and
*Judd v. Board of Education*, 164 Misc. 889, 300 N. Y. S.
1037) transportation of private school children at public
expense has been found valid.

It is, however, not found necessary to consider in the
present case whether text books or any facilities other
than that of transportation of the children may be sup-
plied, for they may be differentiated. Starting with the
interest which the State is acknowledged to have in see-
ing that all children of school age acquire an education
by attending some school, and the fact that they are com-
plying with the law in going to such a school as the
parochial school involved in this case, their accommoda-
tion in the buses appears to the court to be within the
proper limits of enforcement of the duty imposed. Com-
pliance having been made dangerous in a much greater
degree, removal of the danger to any extent would seem
to be within the same public function. Even though the
statute ordering it may be open to another interpretation,
if the transportation with this object is a constitutional
action, the statute must be construed as having the object,

because the court is required to admit the constitution-
ality of an act of assembly if it can be brought within
the exercise of any constitutional power. *Keiningham
v. Blake,* 135 Md. 320, 322, 109 A. 65; *Painter v. Matt-
feldt,* 119 Md. 466, 472, 87 A. 413. The danger of per-
version to private purposes may be admitted, but the
Legislature is primarily entrusted with the care of that,
and the courts have no duty in relation to it unless and
until a perversion should be obvious. The fact that the
private schools, including parochial schools, receive a
benefit from it could not prevent the Legislature's per-
forming the public function.

This conclusion that the act must be regarded as one
within the function of enforcing attendance at school,
renders it unnecessary to consider separately the objec-
tion that a religious institution is aided. Art. 36, Decla-
ration of Rights. The institution must be considered as
aided only incidentally, the aid only a by-product of
proper legislative action.

One further objection is that the accommodation of
private school children violates the requirement of section
3 of article 8 of the State Constitution, that, "The School
Fund of the State shall be kept inviolate, and appro-
priated only to the purposes of education." Apart from
any other reason, this interprets "purposes of education"
too narrowly. It is not denied that transportation comes
within the purposes for which the public money may be
expended when public school children are carried, and
that must be equally true when private school children
are carried, if carrying them is found to be within the
public functions.

*Order affirmed, with costs.*

SLOAN, J., filed a concurring opinion as follows:

I agree with the decision of the majority of every
question raised in this case, but disagree with so much
of the opinion by Judge Bond as holds that the Acts of
1937, ch. 185, can be sustained on the ground of the pro-
tection it affords children attending schools which "do

not receive State aid, and who reside on or along or near to the public highways of Baltimore County, on which there is now or hereafter operated a public school bus or conveyance provided by the Board of Education of Baltimore County (Code, art. 77, sec. 50)" against the hazards of the road. In this respect I agree with the dissenting opinion of Judge Parke.

If the Act of 1937 has any justification it is on the compulsory education of children from the ages of seven to sixteen years, as prescribed by sections 221-230, article 77, of the Code of Public General Laws, by which it is provided, subject to the exceptions and conditions therein prescribed, that children within those age limits must attend the public schools "* * * unless it can be shown to the county superintendent of schools that such a child is elsewhere receiving regular and thorough instruction during such period in the studies usually taught in the public schools of the county to children of the same age." Sections 221 and 222 provide penalties for any person having "* * * a child under his control" who fails to comply with the provisions of section 221, and by section 223 it is provided that "Any person who induces or attempts to induce any child to absent himself unlawfully from school [it does not say public school], or employs or harbors while school is in session any child absent unlawfully from school shall be deemed guilty of a misdemeanor, and be fined not more than fifty dollars."

To assure compliance with the compulsory requirements of the law, provision is made by section 224 for the appointment by the boards of education of attendance officers, and section 225 says: "It shall be the duty of each attendance officer, and said officer shall have full power, within the city or county for which he or she may be appointed, to arrest without warrant any child between seven and sixteen years of age found away from his home, and who is a truant from school, or who fails to attend school in accordance with the provisions of this sub-title. The said officer shall forthwith deliver a child so arrested either to the custody of a person in parental

relation to the child or to the teacher from whose school such a child is then a truant. * * * The attendance officer shall promptly report every such arrest to the school commissioners of the said city or county, respectively, or to such person or persons as they may direct." It should be noted that report of absentees from any school, public or private, shall be made to the school commissioners.

By section 228, "It shall be the duty of the principal or head teacher of every *public or private school* in this State to report immediately to the school commissioners of the county where such school is located, or of Baltimore City if located therein, or to an attendance officer or other official designated by such commissioners, the names of all children enrolled in his or her school who have been absent or irregular in attendance three days or their equivalent without lawful excuse within a period of eight consecutive weeks."

It will thus be seen that the State exercises its control over the education and compels the attendance at school of all children from seven to sixteen years of age, whether they attend public or private schools, and the provision for transportation to and from consolidated schools (Code, art. 77, sec. 50) is an aid to the end and purpose of the compulsory school laws. On this theory, and, in my opinion, only on this theory, can the Acts of 1937, chapter 185, be sustained.

PARKE, J., filed a dissenting opinion as follows, in which Mitchell and Johnson, JJ., concurred.

The writer dissents from the grounds on which the majority of the court holds Chapter 185 of the Acts of 1937 constitutional, and believes his reasons should be stated:

Before the enactment of chapter 185 of the Acts of 1937, the transportation of children to schools in Baltimore county was authorized and controlled by section 50 of article 77, title "Public Education," of the Code of Public General Laws, which provided that "The county board of education shall consolidate schools, wherever in

their judgment it is practicable, and arrange, when possible without charge to the county, and shall pay, when necessary, for the transportation of pupils to and from such consolidated schools." Vol. 2, p. 2455. The policy thus inaugurated began with the passage of chapter 584, section 21, of the Acts of 1904, which introduced the consolidation of public schools, pursuant to the theory that their pupils might be taught by a larger and better qualified corps of teachers, under more convenient, healthful, efficient and superior educational conditions and advantages, in a large school building at a central location. Code, art. 77, sec. 50. The effect of the consolidation was to close numerous local schools, and to require their former pupils to attend the substituted consolidated school at a distance from their neighborhood. Thus the attendance of many children was rendered difficult and burdensome upon both pupil and parents In order to solve the problem thus created and alleviate the hardship entailed, it became advisable or necessary to furnish transportation of the pupils to the consolidated schools, within the constitutional requirement that there shall be established throughout the State a thorough and efficient system of free Public Schools; and that the General Assembly shall provide by taxation or otherwise for their maintenance. Art. 8 of the Constitution of Maryland, section 1.

It should be observed that the statute authorized transportation only for that portion of the pupils who attended the consolidated public schools. The regulations of the Board of Education of Baltimore County further restricted this statutory potential class to the children who might live a mile or more from the consolidated school which they attended. So, pupils who do not attend consolidated public schools must walk or use such means of transportation as they may procure or have privately provided, no matter how great the distance to be traveled. And the pupils who are taught at consolidated schools but who live within the radius of a mile are likewise not supplied with free public transportation, and

must get to school as best they may. At the time chapter 185 of the Acts of 1937 became effective, the Board of Education of Baltimore County also furnished transportation to pupils who attended ten public high schools of the county, for which a charge was made to each pupil carried. The total number of pupils, white and colored, of high and elementary schools so transported was 6,941, at a net transportation cost of $108,523.31. Hence, a great number of pupils in Baltimore County, who were not taught in a consolidated school or a high school, were not supplied with transportation, and walked to the public schools on the highways or were provided with their own means of transportation.

It is evident that the safety of the children on the highways was not the motive which induced the General Assembly in 1904 to authorize free transportation, since the conditions of the grant confined the privilege to a single class of pupils, whose membership was limited to those pupils only who were taught in the consolidated schools. The large number of pupils who attended either the district or unconsolidated schools would not have been excluded from participation in the provision for free transportation if the safety of children on the highway had been the object. The rational and consistent purpose was clearly to relieve the former pupils of district schools of the hardship imposed by the increased distance to the more remote consolidated school into which their district schools had been merged. In illustration of this conclusion is the regulation that free transportation is not afforded even to the pupils of a consolidated school, unless the pupils be a mile or more away from the consolidated school. The inconvenient or excessive distance of certain affected pupils from an available school that would result from consolidation, and not their safety, was the origin of free transportation to the consolidated school. This genesis of this provision of the statute has been commonly accepted during the period following the passage of the Act of 1904. Nor does the public local law of Baltimore County now under consideration disclose any

other motive. Its purpose, in the language of the Act, is to provide that all children, who attend, in Baltimore County, schools which do not receive State aid, and who reside on or along or near to the public highways of Baltimore County on which there is now or hereafter operated a public school bus or conveyance provided by the Board of Education of Baltimore County for transporting children to and from the public schools of Baltimore County, shall be entitled to transportation on the said buses or conveyances, and the same shall be provided for them by the said Board of Education, subject to specified conditions, from a point on the said public highways nearest or most accessible to their respective schools, without changing the routes of said buses or conveyances now or hereafter established by said Board of Education of Baltimore County for transporting children to and from the public schools and such transportation shall be provided by the Board of Education, as aforesaid, for all the children attending the schools described, upon the same terms and conditions as now or as may be hereafter established by the Board of Education of Baltimore County for children attending public schools.

In order to provide for the expenses of the carriage of the additional pupils an annual appropriation of $15,000 is made. The Act further provides for the establishment of new bus routes for the transportation of children not receiving State aid. It empowers the Board of Education to fix the terms and conditions of transportation, provided that, in no event, shall the amount charged children attending such schools for using the buses or conveyances be greater or less than the amount charged children attending the public schools for the same kind of transportation.

The plain and unmistakable purpose of this local legislation is to provide for pupils of private and parochial schools (1) free transportation in buses and conveyances in operation on the routes established for conveying pupils to consolidated public schools in Baltimore County

and (2) transportation for a like reward in buses and conveyances in operation on the routes established for carrying pupils to public high or other schools. Neither in the origin and course of this local legislation through the General Assembly, nor in its terms nor its objects, is there any declaration or implication that the enactment was designed to protect the pupils of private and parochial schools from the perils of pedestrians on public ways.

It is true that an act will not be declared unconstitutional, if it may be supported upon any sound theory of constitutional power; and, so, the argument is here advanced that the legislation is within the police power of the State. It is maintained that if the buses or conveyances have been found in these times to be a protection to pupils against traffic hazards in going to and from the consolidated schools, then these hazards are similarly encountered by children who, in obedience to the statutory necessity of acquiring an education by attendance at some accredited school, are travelers upon the public highways in going to and from approved private and parochial schools; and the removal of these dangers to any extent with reference to these pupils of private and parochial schools would be the performance of the same public function as is done in the case of the pupils who attend the public consolidated and high schools. Thus, it is affirmed, the statute is a valid exercise of the police power.

While it must be conceded that the sovereign state has the inherent and reserved police power to enact laws to promote the good order, safety, health, morals and general welfare of society, nevertheless, this power must be exercised within constitutional limits. The indicated comprehensive scope of this continuing power manifests the difficulties of the subject matter whose development under new conditions has increased the problems involved in fixing its boundaries and prescribing the limits of its exercise. *Comm. v. Alger,* 7 Cush. (Mass.) 53, 85; *Noble State Bank v. Haskell,* 219 U. S. 104, 111, 31 S. Ct. 186,

55 L. Ed. 112; *Deems v. Baltimore,* 80 Md. 164, 30 A. 648; *Welch v. Colgan,* 126 Md. 1, 94 A. 384; *State v. Hyman,* 98 Md. 596, 57 A. 6; *Ford v. State,* 85 Md. 465, 37 A. 172; *Schultz v. State,* 112 Md. 211, 76 A. 592; *Ches. & Pot. Tel. Co. v. Baltimore, etc. Co.,* 66 Md. 399, 7 A. 809; *State v. Gurry,* 121 Md. 534, 88 A. 546; 11 *Am. Juris.,* sec. 249, p. 975, 976.

Generally speaking, it is within the scope and exercise of the police power to enact, within reasonable limits, statutes and ordinances for the protection of persons and property on the public highways. These are commonly regulations for the building, use, care, maintenance and condition of the public thoroughfares. Thus, it is a reasonable exercise of the police power to require a lessened speed in vehicular traffic within a specified section of a highway in a vicinity of a school; and to station traffic officers to regulate and safeguard children at street and highway crossings near schools. The extension of the application of this principle to the transportation of school children, because of the dangers of pedestrian travel by children upon the public highway, is of doubtful legality, even if it be an effort of the State to protect, without discrimination, all school children. Should the statute have this purpose in providing for free transportation of all school children, without discrimination in this exercise of the police power, there is great weight to the argument that the children are the real beneficiaries of the statute, and any advantage derived by the schools attended would be incidental and immaterial. 51 Harvard Law Review, 935. Compare *Cochran v. Louisiana State Board of Education,* 168 La. 1030, 123 So. 664; *Id.,* 281 U. S. 370, 50 S. Ct. 335, 74 L. Ed. 913; *Meyer v. Nebraska* (1923) 262 U. S. 390, 43 S. Ct. 625, 67 L. Ed. 1042; *Pierce v. Society of the Sisters,* (1925) 268 U. S. 510, 45 S. Ct. 571, 69 L. Ed. 1070.

In the appeal at bar this argument cannot prevail. The State builds, maintains and safeguards the highways, and regulates their use in travel and transportation for the convenience, welfare, and safety of the public. In

thus providing, keeping and policing these public thoroughfares, and prescribing and enforcing rules for the control and safety of all kinds of travel, traffic and use, the State has not been held to be under any obligation to supply free vehicular transportation. Furnishing a safe way and regulating its use have been commonly regarded as the limits of public duty; and paternalistic care has not advanced so far as to furnish free carriage for the general public in order to free them of the hazards of being pedestrians on a highway. With respect to children the school age is from seven to sixteen in normal children. In this period of their lives their normal care and custody is in their parents and guardians. In the exercise of its superior power as *parens patriae,* the State compels the children of school age and the requisite mental and physical capacity to attend either a public or an accredited private school. The compulsion is directed against the person having the child under his control. It is he whom the statute commands to see that the child goes to such a school, and it is he against whom the law denounces the prescribed penalty of a misdemeanor if he fail. If the child is a truant from school, the law affords a method to assure his attendance through the agency of an attendance officer. Code, art. 77, secs. 220-225. Thus it is the primary duty of the parent or person in control to see that the child gets to school and back in safety, and it is not to be assumed that those so entrusted with the safety of the child will suffer him to be exposed to the perils peculiar to his years or beyond his capacity to avoid. If this care is not exercised the default is not of the State. Moreover, the onerous burden that would be cast upon the State by the relief proposed is wholly and unreasonably disproportionate to the nature and extent of the hazards of the highway to the school child. In fact, there does not seem to exist the requisite connection between the assumed welfare purpose of the Act and its provisions.

The true basis to support the free transportation of school children to consolidated schools is in the fact that

the policy of closing district schools by the merger of their combined pupils with those in attendance at a remote consolidated school, made the consolidated school inaccessible to the pupils of the former district schools. It was not to assure safety of travel, but to enable the distant pupils to get a public school education, that free transportation became a necessity. In so doing the General Assembly acted in compliance with the command of the Constitution to establish "a thorough and efficient system of free Public Schools." Art. 8 of Maryland Constitution, sec. 1.

If, however, it be assumed that it is a reasonable exercise of the police power to protect children of school age on their way to and from school by furnishing free transportation, even then chapter 185 is not a valid exercise of that power. See *Pollitt v. Lewis*, 269 Ky. 680, 108 S. W. (2nd) 671, reported and annotated in 113 *A. L. R.* 691-724.

As has been seen, neither the general law nor the local statute of Baltimore County affords any basis for the inference that the legislation mentioned had for its purpose the protection of the school children concerned from the hazards of pedestrian travel on the highways. The primary purpose was to afford, within the specified limitations, free or equal facilities in transportation of pupils to schools. There is no question made that the section of the general law authorizing free transportation under specified conditions is a valid administrative provision of a public educational system. *Pasadena City High School v. Upjohn*, 206 Cal. 775, 276 P. 341, as reported and annotated in 63 *A. L. R.* 408-428; *State v. Walters*, 212 Wis. 132, 248 N. W. 777.

The difficulty in the instant case arises from the fact that chapter 185 extends the privilege, in the matter of transportation of the pupils in the designated public schools, to the pupils of private and denominational schools. The legislation, therefore, may not be supported as an integral part of the scheme of public education, and the statute is unconstitutional in that it provides

for the use of public money for a private purpose, unless the transportation provided may be brought within the police power of the State. The Act in question does not embrace *all* school children, who attend private and denominational schools. The general rule is that the power may not be employed for private purposes, nor for the exclusive benefit of particular classes. 11 *Am. Juris., Constitutional Law,* secs. 302-306.

While classification is proper, there must always be uniformity within the class. If the exercise of the police power should operate with substantial equality on all the natural members of the class, which embraces all present and future persons in similar circumstances and conditions, it is not subject to the objection that it is special or class legislation and, so, is neither unreasonable nor in violation of the federal guaranty as to the equal protection of the laws. *State v. Broadbelt,* 89 Md. 565, 43 A. 771; *Great Atlantic & Pacific Tea Co. v. Grosjean,* 301 U. S. 412, 57 S. Ct. 772, 81 L. Ed. 1193; *Phelps v. Board of Education,* 300 U. S. 319, 57 S. Ct. 483, 81 L. Ed. 674.

If, however, persons under the same circumstances and conditions are treated differently, there is arbitrary and capricious discrimination, and the exercise of the police power does not operate uniformly within the class, and the statute is void for unreasonableness and inequality. *Mutual Loan Co. v. Martell,* 222 U. S. 225, 32 S. Ct. 74, 56 L. Ed. 175.

Furthermore, it is settled that a classification to be valid must be based upon material differences between the persons included and those excluded, and there must exist a rational and substantial distinction between the persons who compose the members of the class and those persons who are excluded from its membership. 12 *Am. Juris. Constitutional Law,* secs. 479-481.

The reliance upon chapter 185 as being a valid exercise of the police power in the protection given to certain school children from the hazards of travel upon public highways of Baltimore County by providing trans-

portation to and from their private and denominational
schools must fail because of its arbitrary, capricious and
discriminatory terms and classifications. So far as the
safety of the school children is concerned, there is no
material basis of difference for sound classification be-
tween the school children of the same neighborhood who
use the highways to go to and from their private and
denominational schools. There is no substantial dis-
tinction to be drawn between the hazards of travel to
which they are severally and commonly exposed on the
highways they use in their school days. Nevertheless,
the statute excludes from its protective transportation
benefits all pupils, whether at public, private, or demoni-
national schools, within the radius of a mile of a con-
solidated public or high school, and leaves them, upon
any theory of a reasonable exercise of police power,
inexplicably exposed to the danger of highway pedes-
trian travel. Again, all such pupils who do not reside
"on or along or near" the public highways upon which
the public school bus or conveyance is operated for the
transportation of children, are barred of all the advan-
tages granted by the statute; and remain subject to the
dangers of highway pedestrian travel. Thus it appears
from these illustrative instances that a large number of
children who attend the district public schools and the
private and denominational schools of Baltimore County
will continue to walk the highways or to use privately
provided vehicular transportation, although they sim-
ilarly have the common risk of highway travel of those
within the terms of the Act. Again, pupils of private
schools may be entitled to transportation while public
school children of their vicinity may not ride because
their public school is neither a consolidated nor high
school.

It follows that the statute is not a valid exercise of
the police power, because its provisions are arbitrary and
unreasonable with reference to safety in travel, and the
classifications made exclude school children who are not

to be distinguished from those included on any substantial basis of difference or distinction. *Supra.*

Inasmuch as chapter 185 is found not to be within the scope of the police power of the State to provide for the welfare of the public, the statute is assailed on the ground that the statute is unconstitutional in its authorization of the use of public funds for a private purpose, and in aid of religion.

Whether the children, who are pupils of private or denominational schools which do not receive state aid, or these schools, are the true beneficiaries of the statute, is immaterial, since, in either view, the public funds would be for the advantage of private beneficiaries that, in turn, would depend, although not entirely upon, whether the pupils or the schools furnished the transportation. The qualification made is founded in the peculiar benefit to the school which would follow the advantage of its pupils having the same facilities in transportation to school as do the pupils in the competitive public schools. Neither the payment of money by the State to a private person, whether corporate or otherwise, nor the nature and occupation of that person, is determinative of the purpose of the payment. Thus appropriations by the General Assembly of public funds are customarily made and paid to various bodies and institutions throughout the state, which are privately owned and managed, and which are, in many instances, of sectarian origin and character. It will be found, upon examination, that this employment of public funds has not been for a private purpose but for a public one. It is upon this ground that this employment of public moneys has been sanctioned by the decisions of this court. If an incidental or direct benefit result to the recipient, this resultant advantage becomes immaterial and negligible because of the paramount public and essential nature of the service rendered and of the further factor that the State has either not undertaken or not fully assumed the performance of the public service or function involved. *Clark v. Maryland Institute,* 87 Md. 643,

41 A. 126; Article 43 of Declaration of Rights. The validity of such grants, when so limited, is not affected by any sectarian circumstance. *St. Mary's Industrial School for Boys v. Brown,* 45 Md. 310, 335, 336. Thus, grants to educational institutions which supply instruction and training in learning and mechanical, industrial, agricultural and other arts of which the State does not offer or undertake to afford universal service are freely made without reference to whether the recipient be denominational or otherwise. *St. John's College v. State,* 15 Md. 330; *St. John's College v. Purnell,* 23 Md. 629; *Allegany County School vs. Maffit,* 22 Md. 121; Ch. 7 of Laws of 1784, November Session, Washington College; Chapter 37 of Laws of 1784, November Session, St. John's College; Chapter 107 of Acts of 1793; Chapter 313 of Acts of 1878 (Maryland Institute); Chapter 321 of Acts of 1898; Chapter 90 of Acts of 1912, Johns Hopkins University; Acts of 1937, ch. 515, pp. 1217-1219. Similarly, the grants in aid of the hospitalization of patients for care and treatment in sickness, injury and disease, *Finan v. Cumberland,* 154 Md. 563, 141 A. 269, Acts 1937, ch. 515, pp. 1218-1222, for chronic alcoholism, *Baltimore v. Keeley Institute,* 81 Md. 106, 31 A. 437, for homes for the aged and infirm, for orphans, for children, for the blind, for crippled children, for reformatories and for other purposes which are within the functions of the State as conducive to the welfare of its inhabitants, and pursuant to the mandate of the Declaration of Rights: "That the Legislature ought to encourage the diffusion of knowledge and virtue, the extension of a judicious system of general education, the promotion of literature, the arts, sciences, agriculture, commerce and manufactures, and the general amelioration of the condition of the people." Article 43.

In these grants the State advisedly makes no distinction between denominational and non-denominational institutions, nor has it limited its appropriations to race or color. The grants so made for special public purposes find at once their justification and vindication in the

promotion of the general welfare in those matters of public concern in respect of which the government had not theretofore undertaken completely to perform. In short, although paid to a private person, the money is appropriated and expended for a public use.

On the other hand, and as a necessary and logical complement to the principle which has been here stated, money has not been properly paid for a public purpose, but for a private one, when and should the appropriation and disbursement of public funds to private persons or for their use be an employment of the funds for such an object or purpose which the State has fully and completely assumed and performs for the welfare and benefit of the entire class of its citizens within the object and scope of that purpose. An illustration of this is at hand. The proper and sufficient education of its citizens is of primary concern to the State, whose importance is recognized by the constitutional mandate to the General Assembly that it shall establish by law throughout the State a thorough and efficient system of Public Schools, and shall provide by taxation or otherwise for their maintenance. Const. art. 8, sec. 1. The General Assembly has established and does maintain this system, which affords to every eligible child a free public school education. Code, art. 77, title "Public Education." Authority is conferred for the respective county boards of education to provide free transportation of pupils to and from consolidated schools. *Ibid.* sec. 50.

As has been seen, the Board of Education of Baltimore County provides this free transportation for the pupils of consolidated public schools, and transportation for reward of the pupils in attendance at the public high schools. These educational facilities are universal in their enjoyment by the public schools affected. The duty of the State with respect to transportation is to the public school children, and none other. Should the parent of a child prefer to have him taught in an accredited private, denominational, or parochial private school, the parent may thus educate the child, the statute so

permits, but the child thus withdrawn from the univer-sal system of public schools, becomes, by this withdrawal, a private pupil in a private school at private expense, and, so long as this relation continues, the State is re-lieved, and the pupil is not entitled to share in the bene-fits and advantages of the public school educational sys-tem. Nor is the State under any obligation to educate the pupil at a private school when substantially the same or an equivalent education is afforded in the public school. Hence, there can be no public benefit derived from public money spent to procure what has already been adequately provided for at public expense. If, therefore, money be appropriated by the General Assem-bly to pay for the pupil's tuition, expenses, books and supplies or for his transportation to and from the pri-vate school, or for any other purpose in this connection, it is an appropriation of public funds for a fundamentally private purpose, no matter whether the pupil or the private school be regarded as the real beneficiary of the appropriation. In no true sense was the money raised for a public object.

It is a fact that, to the extent of the education afforded by private schools, including those of the denominational or sectarian class, the pupils in the public schools are lessened, and thereby the general taxpayers of the State are greatly benefited by the corresponding reduction in the cost of public school education. although the burden upon a large class of these taxpayers is increased by the additional expenses of private education by reason of their having pupils at the private schools or being charged with contributions to their support. With these equities, the court has nothing to do by way of adjust-ment. It is the sole and imperative obligation of the court to enforce the law as found in the Constitution and the statutes. With problems of political policy the court has no function to discharge. As this court appre-hends the law, the General Assembly of Maryland had no constitutional power to appropriate public funds for private purposes, and it must be so held. As is stated

by this court in *Baltimore & Eastern Shore R. Co. v. Spring*, 80 Md. 510, at page 517, 31 A. 208, at page 210: "By the Declaration of Rights (article 15), as well as by the fundamental maxims of a free government, taxes can only be imposed to raise money for public purposes. 'Taxes are burdens or charges imposed by the legislature upon persons or property to raise money for public purposes.' *Cooley, Const. Lim.* 479. If it be necessary to cite authorities to maintain this thoroughly established principle, the following may be mentioned: *Citizens' Savings etc. Assn. v. Topeka City*, 20 Wall. 655 [22 L. Ed. 455]; *Cole v. La Grange*, 113 U. S. 1, 5 S. Ct. 416, 28 L. Ed. 896; *Cooley Const. Lim.* sec. 488, and authorities there cited; *Lowell v. Boston*, 111 Mass. 454; *Sharpless v. Mayor etc.*, 21 Pa. 168; *Brodhead v. Milwaukee*, 19 Wis. 652; *St. Mary's Industrial School v. Brown*, 45 Md. [310], 335." Articles 15 and 23 of the Declaration of Rights of Maryland, and 14th Amendment to the Constitution of the United States; *Arnsperger v. Crawford*, 101 Md. 247, 61 A. 413; *Atchison, T. & S. F. R. Co. v. Atchison*, 47 Kan, 712, 714, 28 P. 1000; *Curtis' Admr. v. Whipple*, 24 Wis. 350; *Philadelphia Assn. for Relief of Disabled Firemen v. Wood*, 39 Pa. 73.

The pupils included within the terms of chapter 185 are those who attend private schools, and thus far the statute has been discussed without direct reference to a subdivision of private schools, which is composed of denominational, sectarian, or parochial schools. These schools will be considered under the second adjectival term. The petitioner in the appeal at bar is a pupil in a parochial school which is conducted and controlled by a religious order of the Roman Catholic Church. The point is made that the statute is unconstitutional with reference to all sectarian schools, on the ground that the effect of chapter 185 is an appropriation of public funds in support of a religious denomination, in contravention of article 36 of the Declaration of Rights of the State.

Since it has been seen that chapter 185 is not a valid

exercise of the police power of the State because of the reasons given, and that the appropriation of the public funds is for a private purpose, whether the child or the private school be regarded as the true beneficiary, the objection now considered requires the consideration of whether the pupil or the sectarian school is the actual beneficiary. In a certain sense, the child is a beneficiary, as he is of everything which contributes to his ability to go to school and there to receive an education. However, the existence of the private school is the indispensable prerequisite. Without it, his sectarian education at school cannot be had; nor would any problem of transportation or of accessibility arise. Thus whatever educational benefits are received by the pupil proceed from the school as the primary source to the child. The sectarian school is in competition with the public free school, and cannot maintain its position without sufficient funds. To maintain the parity of its secular advantages with the public school, the sectarian school should provide equal facilities, if the public school supplies transportation to its pupils. If there is to be vehicular carriage of pupils to and from the sectarian school, the transportation service would originate with that school, and the cost of its operation, it is reasonable to assume, would be primarily borne by the school. Any apt means for relieving the sectarian school of providing transportation for its pupils at the immediate charge against public funds is as direct and substantial a donation to the sectarian school, as if the moneys thus appropriated by statute had been paid into the treasury of the school. The device of providing a bus for the common carriage of public and sectarian school children or a bus for their separate carriage cannot affect this conclusion. *State v. Milquet*, 180 Wis. 109, 192 N. W. 392. An appropriation which would be unlawful by direct action may not be lawfully accomplished by indirection. If so, circumvention would attain a new use. There are other purposes and objects more necessary in sectarian schools than the carriage of their pupils, and the theory advanced

would permit public funds to be used to pay either for the athletic supplies and equipment of pupils; or for the fuel bill to keep the school room adequately heated; or for the payment of salaries of instructors; or for musical instruments, encyclopedias, laboratory equipment; or for a fund to cover the traveling expenses of the children in their athletic contests. It is submitted that the use of general taxation for these illustrative purposes is neither reasonably nor logically permissible on the theory that the appropriation is not in aid of sectarian schools, but for the benefit of their pupils. The amount of the fund authorized by the statute is substantial, so the aid contemplated is material. Transportation to and from a school is an important factor in securing and keeping pupils. It is obviously an aid. *State v. Brown,* 6 W. W. Harr. 181, 36 Del. 181, 172 A. 835; *State v. Milquet,* 180 Wis. 109, 192 N. W. 392; *Otken v. Lamkin,* 56 Miss. 758; *Smith v. Donahue,* 202 App. Div. 656, 195 N. Y. S. 715. *Contra: Borden v. Louisiana State Board of Education,* 168 La. 1005, 123 So. 655; *Cochran v. Louisiana State Board of Education,* 168 La. 1030, 123 So. 664. The second case was affirmed in 281 U. S. 370, 50 S. Ct. 335, 74 L. Ed 913. The decision of the state court on the constitutionality of the Louisiana statute was a matter for the state court alone, and the affirmance was simply to the effect that the statute as construed by the state court was not in violation of the 14th Amendment to the Federal Constitution.

Chapter 185 has been seen to provide a material aid to sectarian schools by the use of public funds. So long as a private educational institution of the State of Maryland is not administered for the purpose of religious instruction, although under denominational control, and furnishes a secular education for the citizens of Maryland which is not also universally provided by the State in its educational system, then it is within the power of the State to appropriate public funds for educational uses, if supported by considerations making for the welfare of the public. *St. John's College v. State,* 15 Md.

330; *Allegany County School v. Maffit,* 22 Md. 121; *Clark v. Maryland Institute,* 87 Md. 643, 41 A. 126; *Finan v. Cumberland,* 154 Md. 563, 141 A. 269; *St. Mary's Industrial School v. Brown,* 45 Md. 310. In the appeal at bar a different situation exists. It is conceded by the pleadings that the private sectarian schools which come within the purview of chapter 185 do not give merely a secular education but furnish their pupils with both secular and sectarian education. It necessarily follows that public moneys appropriated for the benefit of such private denominational schools is in aid of the religion under whose ministry or auspices such school is conducted. The problem to decide is whether the General Assembly can make such an appropriation.

Because of the youth and immaturity of their pupils, the public and parochial schools are distinguished and distinct from the higher educational institutions. The schools receive children when very young and instruct them when their wills and minds are plastic and their perceptive and reasoning faculties are undeveloped. So, the State, which has the right to require all its future citizens and voters to be taught, may prescribe, regulate and superintend their education to the extent of exacting that the children be taught and be trained in good morals and good citizenship. For these purposes the State has provided its public school system, but from this system it has excluded all sectarian instruction in obedience to the fundamental conception of the complete separation of state and church. In order to preserve and maintain the State's ancient heritage of liberty of conscience and freedom of religion, the State excludes from its public schools the teaching and practice of any religion in order that all may be tolerated and none be preferred. The principle of separation of state and church, in order that all men may be free in matters of conscience, is part of the organic law, which was expressed in terms of the times in the Constitution of 1776. As thus formulated, the principle has been successively affirmed by the constitutional amendment made

by chapter 167 of the Acts of 1809, and chapter 24 of the Acts of 1810, declaring it unlawful to lay any tax on the people of the State for the support of any religion; and by its promulgation as part of the later Constitutions of 1851 (article 31 of the Declaration of Rights), of 1864 (article 36), and of 1867 (article 37). It now reads: "Art. 36. That as it is the duty of every man to worship God in such manner as he thinks most acceptable to Him, all persons are equally entitled to protection in their religious liberty; wherefore, no person ought, by any law to be molested in his person or estate, on account of his religious persuasion or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; *nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain any place of worship or any ministry.*" *Niles on Maryland Constitutional Law*, pp. 54, 358, 379, 399, 433, 477-478.

The principle thus embodied in the constitutional framework of the State is not limited by a modification of the circumstances which time and conditions have wrought in the form which the subject matter assumes, but subsists in unimpaired efficacy to be firmly vindicated whenever the occasion may arise.

The State enforces the constitutional mandate and the General Assembly has incorporated in the statutory law the inhibition that "school books shall contain nothing of a sectarian or partisan character." Code, art. 77, sec. 129. In its public school system the State universally provides secular education, but does not prevent the child from obtaining secular, or both secular and sectarian education, in private or denominational schools, provided these schools are of the secular standards prescribed by the State. Code, art. 77, secs. 220-228. Within these limitations, the parent or other legal representative of the child may freely choose to send the child to a private school, no matter what may be the ground of

his selection. If the choice be by one who believes, with Walter Bagehot, that "Every parent wisely teaches his child his own creed, and till the child has attained a certain age it is better that he should not hear too much of any other," Bagehot's Works [Traveler's Ins. Co. Ed.] vol. 2, p. 345, and, so, the preference is given to a sectarian school, the decision is within the actor's constitutional rights. *Pierce v. Society of Sisters,* 268 U. S. 510, 45 S. Ct. 571, 69 L. Ed. 1070.

In entire consistency with the exercise of his right by the individual, the State, while the constitutional law remains as it now subsists, may not appropriate public funds in aid of the support and maintenance of a private school where sectarian education, in whole or in part, is taught its pupils. The appropriation made by chapter 185 is, for reasons which have been stated, an aid or . contribution of public funds to sectarian education, and this is forbidden. Compare *State ex rel. Traub v. Brown,* 6 W. W. Harr. 181, 36 Del. 181, 172 A. 835; *People v. State Board of Education,* 245 Ill. 334, 92 N. E. 251; *Knowlton v. Baumhover,* 182 Iowa 691, 166 N. W. 202; *Williams v. Board of Trustees,* 173 Ky. 708, 191, S. W. 507; *Crain v. Walker,* 222 Ky. 828, S. W. (2nd) 654; *Herold v. Parish Board,* 136 La. 1034, 68 So. 116; *Otken v. Lamkin,* 56 Miss. 758; *State v. Scheve,* 65 Neb. 853, 91 N. W. 846, 93 N. W. 169; *State v. Taylor,* 122 Neb. 454, 240 N. W. 573; *State ex rel. Nevada Orphan Asylum v. Hallock,* 16 Nev. 373; *Smith v. Donahue,* 202 App. Div. 656, 195 N. Y. Supp. 715. Compare *Lewis v. Board of Education,* 275 N. Y. 480, 11 N. E. (2nd) 307; *Judd v. Board of Education,* 164 Misc. 889, 300 N. Y. Supp. 1037; *O'Connor v. Hendrick,* 184 N. Y. 421, 77 N. E. 612; *People v. Board of Education,* 13 Barb. N. Y. 400; *Board of Education of Cincinnati v. Minor,* 23 Ohio St. 211; *Commonwealth v. Herr,* 229 Pa. 132, 78 A. 68. But see *Tysong v. School District,* 164 Pa. 629, 30 A. 482; *State v. Weedman,* 55 S. D. 343, 226 N. W. 348; *Synod of Dakota v. State,* 2 S. D. 366, 50 N. W. 632; *State v. Frazier,* 102 Wash. 369, 173 P. 35; *State v. District Board,* 76 Wis. 177, 44 N. W. 967; *State, ex rel. Van Straten v. Milquet,* 180

Wis. 109, 192 N. W. 392. *Contra: Borden v. State Board of Education,* 168 La. 1005, 123 So. 655; *Cochran v. State Board of Education,* 168 La. 1030, 123 So. 664. Compare *Cochran v. State Board of Education,* 281 U. S. 370, 50 S. Ct. 335, 74 L. Ed. 913.

As a result of the views here expressed, chapter 185 of the Acts of 1937 is held invalid on the grounds that the statute is not a valid exercise of the police power and that, on the record, the appropriation is of public funds for both a private and a sectarian purpose.

It may be remarked that a different problem occurs where the private institution, whether denominational or not, renders, at the request of the State and within the State's functions, a service which the State has not undertaken to perform, and appropriates public funds in compensation for such services. In such cases, the appropriation is neither maintenance, contribution nor support, but compensation or remuneration for the public service lawfully undertaken and rendered. No man is thereby affected in his freedom of conscience, nor in his religious liberty, nor are public funds devoted to any save a governmental purpose. The subject suffers no increased burden, since it cannot be assumed that the service would have been directly performed by the State at less cost than the appropriation or subsidy. Again, even if there should be financial gain by the private institution in the service done, the gain would be incidental and immaterial, and not in contravention of the doctrine of separation of state and church. See *Judefind v. State,* 78 Md. 510, 28 A. 405; *Hiller v. State,* 124 Md. 385, 92 A. 842.

The decisions of this court and the immemorial legislative instances of such grants, especially in reference to eleemosynary establishments, and in the promotion of equality of opportunity in collegiate and university education by the establishment of scholarships and other similar provisions, illustrate what may be constitutionally done in this connection. *St. John's College v. State,* 15 Md. 330; *St. John's College v. Purnell,* 23 Md. 629; *Allegany County School v. Maffit,* 22 Md. 121; *Clark v.*

*Maryland Institute*, 87 Md. 643, 41 A. 126; *St. Mary's Industrial School v. Brown,* 45 Md. 310, 335, 336; *Finan v. Cumberland,* 154 Md. 563, 141 A. 269; Washington College, Acts of 1784, ch. 7 (November Session); St. John's College, Acts of 1784, ch. 37 (November Session); Maryland Institute, Acts of 1878, ch. 313; Johns Hopkins University, Acts of 1912, ch. 90; Western Maryland College; St. Mary's Female Seminary; Charlotte Hall School; Home for Incurables; St. Vincent's Infant Asylum; Jewish Children's Society; Church Home Hospital; Mercy Hospital, and others, chapter 515 of Acts of 1937, pp. 1114, 1217-1222, and appropriation acts of preceding assemblies. See *University of Maryland v. Murray,* 169 Md. 478, 484-487, 182 A. 590; *Dunn v. Addison Manual Training School,* 281 Ill. 352, 117 N. E. 993; *Trost v. Ketteler Manual Training School,* 282 Ill. 504, 118 N. E. 743; *St. Hedwig's Industrial School v. Cook County,* 289 Ill. 432, 124 N. E. 629; *State v. Johnson,* 170 Wis. 251, 176 N. W. 244.

While the point is made, the exemption of certain property of churches and religious societies from the burden of taxation is not relevant to the questions on this record. The exemption is firmly established, and is in recognition of the importance of religion to the public welfare. Furthermore, the exemption, in final analysis, takes nothing from the funds which have been raised by taxation, and is made uniform, so that similar property of all sects and denominations is embraced. *Cooley on Taxation* (4th Ed.) secs. 742-746, 773; Code, art. 81, sec. 4; *Baltimore v. Starr Church,* 106 Md. 281, 67 A. 261.

The writer agrees with the opinion of the court so far as it rejects the contentions of the appellant that chapter 185 is invalid on the grounds that either the title of the Act is defective; or the Act is a special law for which provision has been made by an existing general law; or violates section 3 of article 8 of the Constitution of Maryland with reference to the inviolability of the School Fund of the State.